# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| KEITH L. HOLMQUIST and KAY BURDINE HOLMQUIST, f/k/a KAY BURDINE, husband and wife; and FREDERICK A. KASEBURG, a single man,<br><br>     Respondents,<br><br>     v.<br><br>KING COUNTY, a political subdivision of the State of Washington; and CITY OF SEATTLE, a municipal corporation,<br><br>     Appellants. | DIVISION ONE<br><br>No. 70500-8-I<br>(Consol. with No. 70504-1-I)<br><br>PUBLISHED OPINION<br><br><br><br><br><br>FILED: June 30, 2014 |

DWYER, J. — In 1926, two individuals signed real estate installment contracts, a form of executory contract, to purchase properties on Lake Washington from the Puget Mill Company. In 1932, while both individuals were still making timely installment payments, the King County Board of Commissioners vacated the street separating the two properties. The timing of the street vacation is what has, 80 years later, led to this property ownership dispute between Keith and Kay Holmquist, Frederick Kaseburg, King County, and the City of Seattle.

It has long been the law in this state that a plat presumptively grants an easement interest, not a fee interest, to the public in the streets appearing thereon. When the public possesses easement rights to a street, any conveyance of the abutting parcels will presumptively convey half of the property

underlying the street. However, if the street is vacated while the platter still owns both abutting properties, any conveyance thereafter will not presumptively include the vacated land.

In this case, the street was vacated after the two individuals contracted to purchase the abutting properties, but before either completed performance under the contract and received a deed. Pursuant to the law in 1932, executory contract purchasers had the right to receive a deed to the contracted-for property once the entire purchase price was paid. That right ran with the land, unless a bona fide purchaser for value without notice of the contracts procured the land from the original seller. Here, when the Puget Mill Company contracted to sell the abutting properties, half of the street was included in the land to be conveyed to each of the purchasers. In 1932, after one of the executory contracts was recorded, the Puget Mill Company gifted the vacated street by quitclaim deed to King County. Because King County was not a bona fide purchaser for value without notice, each of the contracting individuals gained equitable title to half of the vacated street upon payment of the full contract price. Accordingly, we hold that the trial court did not err by quieting title to the property in the successors in interest of the contracting individuals.

I

The property in dispute is a 60-foot-wide strip of land on the shore of Lake Washington. The legal description of the property is as follows:

> All that portion of land, sixty feet in width, lying east of the Northern Pacific Right-of-Way between Tract 12, Block 1 and Tract 1, Block 2, Cedar Park Lake Front as per plat recorded in volume 29 of

plats, page 47 records of King County Auditor; situate in the City of Seattle, County of King, State of Washington.

In 1926, this piece of property and the area surrounding it were situated in King County in a neighborhood known as Cedar Park. All real property located in Cedar Park was owned by the Puget Mill Company. The Puget Mill Company platted the land and recorded documentation of the plat, which contained the following dedication:

> Know all men by those presents that the Puget Mill Company, a corporation, organized and existing under the laws of the State of California, and having its principal place of business in the City of San Francisco, owner in fee simple of the tract of land plotted in this plat of Cedar Park Lake Front, hereby declare this plot and dedicate to the use of the public forever all the streets shown hereon and the use thereof for all public purposes not inconsistent with the use thereof for public highway purposes, also the right to make all necessary slopes for cuts and fills upon the tracts and blocks shown upon this plot in the reasonable, original grading of streets shown hereon.[1]

One of the dedicated streets depicted on the plat was the end of E 130th Street.[2]

On August 17, 1926, Mona Müller entered into an executory contract to purchase the plot of land immediately north of the end of E 130th Street. This contract was not recorded and no record of it has been found; however, it is referenced in the deed to the property. Müller is the predecessor in interest of the Holmquists.

On November 1, 1926, J.I. Shotwell entered into an executory contract to purchase the plot of land immediately south of the end of E 130th Street. The

---

[1] The plat was signed by the Puget Mill Company on October 11, 1926 and filed with King County on October 20, 1926. A corrected plat was filed on December 7, 1926.

[2] Since renamed NE 130th Street.

-3-

executory contract described the parcel solely by its platted lot number. Shotwell recorded the contract on September 29, 1927.[3] Shotwell is the predecessor in interest of Kaseburg.

On April 26, 1932, Shotwell, Müller, and numerous others filed a petition to vacate E 130th Street east of the Northern Pacific Railway right-of-way.[4] On June 25, 1932, Shotwell and Müller executed a quitclaim deed conveying that same property to the Cedar Park Community Club, although the deed was never delivered. Shotwell's and Müller's purpose in doing so was to designate the land as a community beach. On June 27, 1932, the King County Board of Commissioners voted to vacate the street at the end of E 130th Street (the area at issue herein).

On August 10, 1932, the Puget Mill Company executed a quitclaim deed conveying its interest in the vacated street to King County. This deed was lost and a replacement deed was executed on March 30, 1935. The quitclaim deed was recorded on April 10, 1935.

Müller and Shotwell each made full payment pursuant to the terms of their respective contracts with the Puget Mill Company. Accordingly, the Puget Mill Company conveyed a deed to the property north of the vacated street to Müller on September 20, 1933. The deed was recorded seven days later. The Puget Mill Company conveyed a deed to the property south of the vacated street to

_____

[3] The various parties have litigated this matter under the assumption or implied agreement that the contracts of Shotwell and Müller were identical as to material terms. We resolve the issues presented herein consistent with the record as developed by the parties.

[4] This is the area platted for a street lying between the numbered lots being purchased by Shotwell and Müller, respectively. The legal description of this area is as previously set forth.

Shotwell on March 8, 1935. The deed was recorded, although it is unclear from the record when this occurred. Both deeds describe the properties conveyed by referencing their platted lot numbers.

The Cedar Park neighborhood was annexed by the City of Seattle in 1954.

In 2012, the current owners of the abutting properties, the Holmquists and Kaseburg, brought a quiet title action against King County. Seattle later intervened with permission of the trial court. The trial court granted summary judgment in favor of the Holmquists and Kaseburg, holding that each held title to one half of the vacated land, free and clear of any interest of either King County or Seattle. The trial court also awarded attorney fees to the Holmquists and Kaseburg against King County.

King County and Seattle filed separate appeals, which have been consolidated.

II

King County and Seattle[5] contend that the trial court erred by quieting title in the Holmquists and Kaseburg. This is so, they assert, because Hagen v. Bolcom Mills, 74 Wash. 462, 133 P. 1000, reh'g denied 134 P. 1051 (1913), and Ashford v. Reese, 132 Wash. 649, 233 P. 29 (1925), dictate that the Puget Mill Company owned the property at issue in 1932 and, therefore, that the governments have an interest in it now. Although the Puget Mill Company did

---

[5] The parties to this appeal assume that Seattle had a colorable claim of interest in the property such that its intervention was proper. The record does not reveal the nature of this claim. Nevertheless, we need not address this concern in order to resolve this appeal.

-5-

hold legal title to the property in 1932, neither King County nor Seattle has any interest in it now.

The superior court resolved this matter on summary judgment. We review the grant of summary judgment de novo. Fiore v. PPG Indus., Inc., 169 Wn. App. 325, 333, 279 P.3d 972, review denied, 175 Wn.2d 1027 (2012). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). In reviewing a summary judgment order, we view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Dumont v. City of Seattle, 148 Wn. App. 850, 861, 200 P.3d 764 (2009).

We first clarify the original status of the property. When the Puget Mill Company platted the Cedar Park neighborhood in 1926, it dedicated E 130th Street as a public highway. It has long been the law that the platting of a public street presumptively creates an easement for public use. Kiely v. Graves, 173 Wn.2d 926, 930, 271 P.3d 226 (2012) (citing Schwede v. Hemrich Bros. Brewing Co., 29 Wash. 21, 69 P. 362 (1902)); see also Holm v. Montgomery, 62 Wash. 398, 399, 113 P. 1115 (1911) ("It has become the settled rule of this court that the public has only an easement of use in a public street or highway."). The language of the Puget Mill Company's dedication is consistent with this presumption. The Puget Mill Company stated that it was dedicating the use of the roads, not the ownership of the roads to the public.

> Know all men by those presents that the Puget Mill Company, a corporation, organized and existing under the laws of the State of California, and having its principal place of business in

> the City of San Francisco, owner in fee simple of the tract of land plotted in this plat of Cedar Park Lake Front, hereby declare this plot and dedicate *to the use of the public* forever all the streets shown hereon and *the use thereof* for all public purposes not inconsistent with *the use thereof* for public highway purposes, also the right to make all necessary slopes for cuts and fills upon the tracts and blocks shown upon this plot in the reasonable, original grading of streets shown hereon.

(Emphasis added.) Thus, by the terms of the dedication, prior to 1932, King County held a right-of-way easement over E 130th Street. When the public holds only a right-of-way easement, fee title to the land underlying the street remains with the platter: "the laying out of a street is not a surrender of title." Chlopeck Fish Co. v. City of Seattle, 64 Wash. 315, 323, 117 P. 232 (1911).[6] Accordingly, fee title to the land underlying E 130th Street remained with the Puget Mill Company.[7]

III

That King County held only an easement interest in the area platted as E 130th Street affected the interests of the parties to the executory contracts. Because the Puget Mill Company held fee title to the land underlying the street, it had the right to convey that property notwithstanding the existence of the

---

[6] Although the platter in Chlopeck was the State of Washington, the same rule pertains when the platter is a private entity. See Burmeister v. Howard, 1 Wash. Terr. 207, 211 (1867) ("[W]hen an easement is taken as a public highway, the soil and freehold remain in the owner of the land encumbered only with the right of passage in the public.").

[7] The presumption discussed is not a conclusive one. As our Supreme Court explained: "'The intention of the owner is the very essence of every dedication.'" Frye v. King County, 151 Wash. 179, 182, 275 P. 547 (1929) (quoting City of Palmetto v. Katsch, 86 Fla. 506, 510, 98 So. 352 (1923)). Intent must be adduced from the plat itself. Id. When an individual seeks to dedicate a fee interest, "that intent should be clearly stated and the use should be unrestricted or, if the use is a condition, the condition should be clearly stated with a specific right of reversion." [WASHINGTON REAL PROPERTY] DESKBOOK § 91.9(1) [(3d ed. 2001)]. Kiely, 173 Wn.2d at 933-34 (footnote omitted). Here, as discussed, the words of the plat are consistent with the presumption.

easement. Even before a street is vacated, "the owner can sell a lot adjoining a street, and part with or reserve the interest in the street, subject to the easement, as he sees fit." White v. Jefferson, 110 Minn. 276, 282, 124 N.W. 373, reh'g denied, 125 N.W. 262 (1910).[8] That is precisely what the Puget Mill Company did.

Pursuant to the law in 1926, a conveyance of a property abutting a street was presumed to convey half of the underlying street by implication.

> [A] conveyance of land abutting upon a public highway carries with it the fee to the center of the highway as part and parcel of the grant. No language is required to express such an intent on the part of a grantor in whom the title to the lot and highway vests. It follows as an inference or presumption of law that, in selling the land abutting upon the highway, he intended to sell to the center line of the adjoining highway. Rowe v. James, 71 Wash. 267, 128 Pac. 539 [(1912)]. While the intention to pass such a title is always presumed and requires no special words to create it, the contrary intention will never be presumed, and before it will be held that it was the intention of the grantor to withhold his interest in the highway after parting with his title to the adjoining land, such declaration of intent must clearly appear. Gifford v. Horton, 54 Wash. 595, 103 Pac. 988 [(1909)]. Deeds may expressly exclude the streets, but unless they do, the implication is that the street is included. Cox v. Freedley, 33 Pa. St. 124, 75 Am. Dec. 584 [(1859)].

Bradley v. Spokane & Inland Empire R.R. Co., 79 Wash. 455, 459-60, 140 P. 688 (1914).[9]

Shotwell's contract described the property by its lot number on the recorded plat. By describing the property in this manner, "the intention of the grantor making such conveyance is that his vendee is entitled to all the

---

[8] The opinion in White is cited with approval by the court in Hagen. 74 Wash. at 467-70.
[9] This remains the law. See Christian v. Purdy, 60 Wn. App. 798, 802, 808 P.2d 164 (1991).

appurtenant advantages and rights which the plat proclaims to exist, so far as the land included in it is owned by the grantor." Olin v. Denver & R.G.R. Co., 25 Colo. 177, 179, 53 P. 454 (1898); accord Van Buren v. Trumbull, 92 Wash. 691, 693-64, 159 P. 891 (1916) ("'Where, therefore, lots have been offered for sale, and have been purchased in accordance with a map or plat upon which streets are made to appear, it is presumed that the purchase was induced, and the price of the lots enhanced thereby, and the seller is estopped to deny the right which has thus been acquired.'" (quoting City of Norfolk v. Nottingham, 96 Va. 34, 30 S.E. 444, 445 (1898))). One of those appurtenant rights was presumed fee title to the middle of E 130th Street. When they entered into the respective contracts, by not specifically providing otherwise, Shotwell, Müller, and the Puget Mill Company all contracted for the sale of the numbered parcels accompanied by each parcel's appurtenant interest in half of the platted street. Accordingly, Shotwell and Müller, upon full performance on their respective parts, were entitled to receive legal and equitable title to all of the property subject to the contracts, including the respective interests in half the street.

IV

Nonetheless, King County and Seattle contend that the foregoing analysis is irrelevant. This is so, they assert, because pursuant to the Ashford decision, Shotwell and Müller had no interest in the abutting properties until they received their deeds. We disagree.

In Ashford, our Supreme Court stated that, "an executory contract of sale in this state conveys no title or interest, either legal or equitable, to the vendee."

-9-

132 Wash. at 650.[10] In the five years following the Ashford decision, the Supreme Court issued a series of supplemental opinions clarifying both the effect of that decision and those rights contract purchasers possessed, despite lacking title. Three years after Ashford, the court held, "Undoubtedly such purchaser does have a right of possession *and a right to acquire title in accordance with the terms of the contract.* Such rights, though not amounting to title, are substantial rights such as one having notice and knowledge is bound to respect." Oliver v. McEachran, 149 Wash. 433, 438, 271 P. 93 (1928) (emphasis added). The following year, the Supreme Court held that although the rights of contract purchasers "do not rise to the dignity of title, either legal or equitable," they "are annexed to and are exercisable with reference to the land, and therefore come within the designation of 'real property.'" State ex rel. Oatey Orchard Co. v. Superior Court for Chelan County, 154 Wash. 10, 12, 280 P. 350 (1929). With respect to contract sellers, the Supreme Court characterized their interest as "a legal title subject to be defeated absolutely by a performance of the contract on the part of the grantees, and subject to be reinstated in full on a breach of the contract." Culmback v. Stevens, 158 Wash. 675, 681, 291 P. 705 (1930).[11]

These rights and obligations were not altered or extinguished by the street vacation. Vacation of a street does not diminish the rights of private parties

---

[10] Ashford was overruled in 1977. See Cascade Sec. Bank v. Butler, 88 Wn.2d 777, 780, 567 P.2d 631 (1977).

[11] None of these cases purported to overrule Ashford. In all three cases, the court viewed its holding as being in harmony with Ashford. As explained, "neither in the Ashford case or elsewhere has this court said that a purchaser in possession under an executory contract has no rights." Oliver, 149 Wash. at 438.

-10-

possessing an interest in the underlying land. Rowe, 71 Wash. at 271 (citing Comm'rs of Coffey County v. Venard, 10 Kan. 95, 100 (1872)). Thus, the street vacation did not—and could not—have the legal effect of altering the Puget Mill Company's underlying fee interest. Moreover, the street vacation did not have the legal effect of extinguishing Shotwell's and Müller's contractual rights. See Omaha Loan & Trust Co. v. Goodman, 62 Neb. 197, 86 N.W. 1082, 1085 (1901) (street vacation had no effect on university board's contract to purchase land).[12]

The actual effect of street vacations was articulated by the Supreme Court in Hagen: "[T]he general rule [is] that, upon the vacation of a street or alley, the land thus relieved of the public easement therein becomes attached to, and passed by deed under a description of the abutting property." 74 Wash. at 466. "The reason" for this rule, the court stated, was "that the law will presume that [the abutting landowners] have paid an enhanced value therefor in consequence of the prospective use of the street." Hagen, 74 Wash. at 466.

As the court explained, the general rules regarding street vacations are "qualified when the circumstances of the particular case demand it." Hagen, 74 Wash. at 465. In that case, the particular circumstances led the court to conclude that the vacated street was a separate parcel belonging to the seller. When the street was vacated in 1889, Seattle Iron & Steel Manufacturing Company owned both of the abutting properties. Hagen, 74 Wash. at 463. For any conveyance thereafter, "'[t]he parties would contract with reference to a

_____

[12] Goodman was cited with approval in Broadway Hosp. & Sanitarium v. Decker, 47 Wash. 586, 591, 92 P. 445 (1907).

record showing that no street existed, where the vacation proceedings are required to be recorded.'" Hagen, 74 Wash. at 469 (quoting White, 110 Minn. at 284). Seattle Iron did not sell any of its property until 1900. Hagen, 74 Wash. at 464. Thus, when the plaintiff contracted to buy the property, he could not impliedly own out to the middle of the street because there was no street. Hagen, 74 Wash. at 473-74. Instead, "the title to the vacated street passed in fee simple," to Seattle Iron as a separate parcel. Hagen, 74 Wash. at 466.

This approach was reaffirmed in Raleigh-Hayward Co. v. Hull, 167 Wash. 39, 8 P.2d 988 (1932).[13] In that case, Kla-Pache Avenue was vacated in 1921, a time at which Willapa Improvement Company owned all of the surrounding properties. Raleigh-Hayward, 167 Wash. at 40-41. Willapa did not convey any property until 1923. Raleigh-Hayward, 167 Wash. at 41. The court, in reliance on Hagen, held that "the rule does not apply that purchasers acquire the fee to a platted street when, as a matter of fact, at the time of the purchase there was no platted street." Raleigh-Hayward, 167 Wash. at 44. Thus, "after Kla-Pache avenue was vacated, it became a distinct parcel of land, and did not pass as an incident or appurtenance to the lots by the several conveyances from the company to the respondents." Raleigh-Hayward, 167 Wash. at 43.

Of course, this case does not resemble Hagen or Raleigh-Hayward, because here there was a platted street when Shotwell and Müller contracted to buy their parcels. As previously noted, a conveyance of a property abutting a

---

[13] Raleigh-Hayward was decided in March 1932, three months before the portion of E 130th Street at issue herein was vacated.

street presumably conveys half of the underlying street by implication. Bradley, 79 Wash. at 459-60. Thus, unlike in Hagen and Raleigh-Hayward, the predecessors to the parties herein contracted with the implied intent that half of the street would be included in each conveyance.

In light of the case authority discussed, it cannot be said that the Hagen decision resulted in the Puget Mill Company acquiring unencumbered ownership of the land underlying the street upon its vacation. "'[H]e who has already been once paid for his land cannot, in equity, be heard to assert title thereto as against one who has paid him the consideration therefor.'" Hagen, 74 Wash. at 467 (quoting Olin, 25 Colo. at 183). Prior to the street being vacated in 1932, the Puget Mill Company had contracted to sell the two halves of the underlying property to Shotwell and Müller, and had already received partial payment and timely performance under those contracts. As with the adjoining numbered lots, the Puget Mill Company held legal title to the halves of the vacated street "subject to be defeated absolutely by a performance of the contract on the part of the grantees." Culmback, 158 Wash. at 681. Neither Shotwell nor Müller were delinquent in their payments in 1932. When each completed payment under their executory contracts, the Puget Mill Company was contractually obligated to convey the vacated land to them.

V

Instead of conveying the vacated land to Shotwell and Müller, however, the Puget Mill Company conveyed the land by quitclaim deed to King County. Nonetheless, the Puget Mill Company's execution of a quitclaim deed in favor of

-13-

King County extinguished neither Shotwell's nor Müller's preexisting contractual interests.

Culmback demonstrates that this is so. In that case, Richardson signed an executory contract to purchase a parcel of land from Smith. Culmback, 158 Wash. at 676. Smith assigned the right to receive the contract's installment payments to Stevens. Culmback, 158 Wash. at 676-77. Thereafter, Smith declared bankruptcy. Culmback, 158 Wash. at 677. Despite the fact that Smith retained naked legal title to the property, our Supreme Court held that the bankruptcy trustee was entitled to nothing. Culmback, 158 Wash. at 681. By entering into the executory contract, the only true interest retained by Smith was "the right to receive the payments as they fell due on the contract," which Smith had assigned to Stevens prior to declaring bankruptcy. Culmback, 158 Wash. at 681. The court held that,

> "The vendor in a land contract who assigns that contract or the right to the payments thereunder to another holds the legal title to the land in trust for the two parties under that contract, and *such trust persists and accompanies the legal title wherever it may go*, unless, indeed, into the hands of a *bona fide* holder for value. Of course, *when payment is completed that trust is solely and exclusively for the purchaser, who thereby gains the complete equitable title* to the land."

Culmback, 158 Wash. at 682 (emphasis added) (quoting Foster v. Lowe, 131 Wis. 54, 110 N.W. 829, 831 (1907)). Any transfer of title to the bankruptcy trustee, who was not a bona fide purchaser for value, could not have extinguished Richardson's rights to the property. "[N]aked legal title to the property" remained "in trust" for Richardson's benefit, and as such, it was not an

-14-

asset of Smith's that could be acquired by the bankruptcy trustee. Culmback, 158 Wash. at 681.

By using a quitclaim deed, the Puget Mill Company conveyed to King County, "all the then existing legal and equitable rights of the grantor in the premises therein described." REM. REV. STAT. § 10554. As such, the Puget Mill Company could only convey the interest it retained in the property and no more, unless conveyed to a bona fide purchaser for value without notice. Cf. McDonald v. Curtis, 119 Wash. 384, 385, 205 P. 1041 (1922) (judgment creditor could "acquire no greater interest in the property" than debtor possessed). The interest that the Puget Mill Company held in the vacated property was subject to Shotwell's and Müller's contracts. Thus, unless it was a bona fide purchaser for value without notice, King County's title to the property after it received the quitclaim deed was also subject to Shotwell's and Müller's contracts.

The parties present no evidence that King County was a bona fide purchaser for value of the vacated land. The deed to King County for the vacated street shows that the consideration given for the property was $10. The nominal amount demonstrates that the transfer was a gift, not a bona fide purchase for value.

Moreover, King County accepted the quitclaim deed with notice of Shotwell's contract. In 1927, the legislature enacted a bill allowing real estate purchasers to record executory contracts. Laws of 1927, ch. 278, § 3. Once the contract was recorded, it served as "notice to all persons of the rights of the vendee under the contract." Laws of 1927, ch. 278, § 3. Shotwell took

advantage of this statute and recorded his contract in September 1927. Thus, when it accepted the quitclaim deed in 1932, King County was on notice that at least half of the street was subject to be conveyed upon completion of an executory contract and that the Puget Mill Company was not conveying unencumbered title to the area of the vacated street.

Because it was not a bona fide purchaser for value without notice in 1932, King County held the vacated property "in trust" for Shotwell and Müller pending completion of their contracts. Shotwell and Müller both paid the contracted purchase price in full. After each completed payment, King County, like the bankruptcy trustee in Culmback, was no longer entitled to anything. Rather, Shotwell and Müller "'gain[ed] the complete equitable title to the land,'" including one half each of the vacated property. Culmback, 158 Wash. at 682 (quoting Foster, 110 N. W. at 831).

Thus, because Shotwell and Müller gained equitable title to the vacated property upon satisfaction of their contractual obligations, the trial court did not err by quieting title in favor of their successors in interest, the Holmquists and Kaseburg.

Affirmed.

We concur:

-16-